Hermann R. **HABICHT**

v.

**UNITED STATES.**

No. 102-55.

United States Court of Claims.
June 7, 1961.

Madden, J., dissented.

Lewis W. Evans, Washington, D. C., for plaintiff. Samuel T. Ansell, Jr., and Martin E. Carlson, Washington, D. C., were on the briefs.

Gerson B. Kramer, Silver Spring, Md., with whom was Asst. Atty. Gen. William H. Orrick, Jr., for defendant.

WHITAKER, Judge.

Plaintiff, a former Foreign Service employee, sues for back pay and for payment of accrued annual leave for a portion of the period during which he was suspended from duty for security reasons.

On October 16, 1949, plaintiff was appointed to a "sensitive" position as Chief, Reports Branch, Reports and Statistics Division, Office of Administration, United States High Commissioner for Germany (hereinafter referred to as HICOG). Plaintiff's appointment was limited to a period not to exceed four years, and was subject to the following conditions: "Continuance of program, functions of assignment, and availability of funds therefor."

Pursuant to the Security Act of August 26, 1950, P.L. 733, 64 Stat. 476, 5 U.S.C.A. § 22–1, plaintiff was suspended from active duty on June 6, 1951, in the interest of national security, and, therefore, was placed in a leave status without pay pending the adjudication of his case. During July 1951 hearings were held in Germany by the Loyalty Security Board, HICOG, to determine whether plaintiff was a security risk.

Plaintiff remained in a leave without pay status pending the outcome of the Loyalty Security Board hearings. On September 2, 1951, he was transferred from the Reports Branch, Reports and Statistics Division, Office of Administration, HICOG, to the Replacement Pool, Personnel Division, Office of Administration, HICOG, and continued in the status of leave without pay. The following day, September 3, the Reports and Statistics Division was abolished and the functions which had been performed by plaintiff's office were either eliminated or transferred to other offices. Plaintiff at this time received no official notification that his former position had been abolished.

The proceedings before the Loyalty Security Board culminated in a letter, dated January 25, 1952, to plaintiff from the Deputy Under Secretary of State stating that it had been determined that plaintiff was a security risk and his removal was deemed advisable in the interest of national security. Plaintiff appealed from this decision to the Secretary of State.

On February 19, 1952, while plaintiff's appeal was pending, the Chief of Personnel, HICOG, wrote plaintiff that the position he had formerly held had been abolished,[1] and his limited appointment was terminated, subject to final disposition of his case under the Security Act of August 26, 1950. This letter stated that should his appeal to the Secretary be successful, his termination would be effective on the day after the date on which the Secretary rendered his decision. If plaintiff's appeal was unsuccessful, he was instructed to disregard the notice.

Plaintiff's appeal was heard on April 18, 1952, and on January 19, 1953, the Deputy Under Secretary of State wrote plaintiff that "the evidence does not warrant an adverse security finding * * * [and] does not warrant your dismissal as a security risk to the Department of State." The letter continued:

"The Secretary has reviewed and concurred in his designee's finding and has determined that the termination of your employment in the Foreign Service is not necessary or advisable in the interest of the national security of the United States."

Two days later, on January 21, 1953, the State Department sent HICOG the following telegram:

"Favorable LSB finding H. R. Habicht upheld. Dept. authorizing HICOG reimburse for period from 6/6/51 to 3/19/52. Term. LWOP 1/20/53. Ltr. fols."

That same day, the Department wrote plaintiff that the Secretary had approved the recommendation of the Deputy Under Secretary that:

"* * * reimbursement be made you pursuant to provisions under [the Act of August 26, 1950] for the period from June 6, 1951, to March 19, 1952, (February 19, 1952, the date your HICOG position was abolished, plus thirty days notice of separa-

ration provided for in HICOG regulations) during which you have been carried in a leave without pay status."

On January 27, 1953, the Chief of Personnel, HICOG, wrote plaintiff that his service with HICOG was officially terminated effective January 20, 1953, and plaintiff was issued a Notice of Personnel Action advising plaintiff as follows:

"*Nature of Action:* Termination of Limited Appointment E.O. 10180 and Restoration to Duty.

"*Effective Date:* cob: Jan. 20, 1953 see remarks.

"*Remarks:* Restored to duty for period June 6, 1951 to March 19, 1952. Ref.: Letter to Mr. Habicht from Chief, Division of Foreign Service Personnel dated January 21, 1953, and classified cable dated January 22, 1953. Placed on LWOP effective March 20, 1952 to January 20, 1953 cob."

Plaintiff has received from defendant salary for the period June 7, 1951 to March 19, 1952, and a lump sum payment for 994 hours of annual leave accrued through December 31, 1951. However, plaintiff claims he is entitled to back pay for the period March 20, 1952 to February 20, 1953, and payment for annual leave for the period January 1, 1952 to January 27, 1953, based upon the premise that the Security Act of August 26, 1950, supra, required that he be paid for the entire period between the date of his suspension from active duty and the date his employment with the Foreign Service was officially terminated. Defendant, on the other hand, says that the Act gave the Secretary of State authority to restore plaintiff to duty for the period from the date of his suspension to the date his position was abolished, and that it was only required to pay plaintiff for this period.

---

1. Internally, HICOG considered plaintiff's position to have been abolished upon the termination of the Division. It nevertheless selected the date of formal notification, February 19, 1952, as the cutoff date for subsequent reference to the abolition of his position.

Section 22–1 of the Security Act of August 26, 1950, supra, provides in pertinent part as follows:

"That any person whose employment is so suspended or terminated under the authority of this Act *may, in the discretion of the agency head concerned, be reinstated or restored to duty, and if so reinstated or restored shall be allowed compensation for all or any part of the period of such suspension or termination* in an amount not to exceed the difference between the amount such person would normally have earned during the period of such suspension or termination, at the rate he was receiving on the date of suspension or termination, as appropriate, and the interim net earnings of such person: * * *." [Italics supplied.]

By this section, Congress granted discretion to the Secretary to right a possible wrong committed under the Act by ordering reinstatement or restoration. Once an employee is reinstated or restored to duty, this section made mandatory the payment of back pay. Leiner v. United States, 143 Ct.Cl. 806; Schwartz v. United States, Ct.Cl. 181 F. Supp. 408. However, this section did not, as plaintiff urges us to hold, require that the Secretary must allow compensation for the full period of the suspension. Section 22–1 required the payment of compensation for "all or *any part*" of the period of suspension. It was within the discretion of the Secretary to determine whether justice required payment for the full period of suspension or only for a part of it.

This question was not presented in Leiner v. United States, supra, or in Schwartz v. United States, supra, but it was the basis of the dissent by the Chief Judge in Vitarelli v. United States, Ct. Cl., 279 F.2d 878.

In the case at bar the Secretary was of the opinion that plaintiff should be paid from the date of his suspension to the date of the abolishment of the job to which he had been appointed. We cannot say that this was an abuse of the discretion conferred upon him. We would be slow to say it was in any case, but in this case we see no warrant at all for saying that it was. Plaintiff's appointment was subject to the "continuance" of the "functions of assignment." This means, we suppose, if the functions of the position to which plaintiff had been assigned were discontinued, plaintiff's appointment was terminated, or, at least, could be terminated. His position was abolished on September 3, 1951, but, since plaintiff was not notified thereof until February 19, 1952, he was compensated until 30 days after the latter date.

It is true that on the date prior to the abolishment of his position plaintiff had been transferred to the Replacement Pool, but there was no obligation on the Department to take plaintiff out of this pool and assign him to some other position.

We think the action the Secretary took was within the discretion conferred on him.

On January 21, 1953, the Secretary approved the allowance of compensation to plaintiff for the period June 6, 1951 to March 19, 1952, and plaintiff has received the pay to which he was entitled for this period. Under the statute the Secretary had the discretion to determine the period for which plaintiff was to be compensated, and he cannot recover more.

However, it appears that plaintiff has not received payment for all leave accrued during the period for which he was restored to duty. Defendant refused to pay plaintiff for any accrued leave in excess of 994 hours, which was his annual leave "ceiling" as of January 1, 1952. In Hynning v. United States, 141 Ct.Cl. 486, we held that an employee continues to accumulate annual leave during a period of suspension under the Act of August 26, 1950, even though his individual "ceiling" is exceeded. Since plaintiff was entitled to and received back pay for the period June 7, 1951 to March 19, 1952, he was also entitled to payment for any annual leave which accrued to him during this same period. Plaintiff only received payment for accrued leave

up to and including December 31, 1951; hence, he is entitled to recover for any annual leave which accrued during the period January 1, 1952 to March 19, 1952.

The plaintiff is entitled to recover, and judgment will be entered to that effect. The amount of recovery will be determined pursuant to Rule 38(c), 28 U.S. C.A.

It is so ordered.

JONES, Chief Judge, and DURFEE, and LARAMORE, Judges, concur.

MADDEN, Judge (dissenting).

When the plaintiff was, on September 2, 1951, transferred from the Reports Branch, Reports and Statistics Division, to the Replacement Pool, Personnel Division, he was, like all other employees of the Reports Branch, placed in a reserve on which the High Commissioner could draw for assignment to any necessary personnel work. The reason these employees were placed in the replacement pool was that the High Commissioner, on the day following their transfer to the Replacement Pool, abolished the Reports Branch and thereby abolished the jobs of the employees who worked in the Reports Branch. But the other employees who were so transferred were not discharged nor separated from the payroll. Nor was the plaintiff discharged. The only reason for his not being paid, and not being assigned from the pool to specific work, was that he was under suspension as a security risk.

Section 22–1 of the Security Act of August 26, 1950, quoted in the opinion of the court, says that if one whose employment is suspended or terminated as a security risk is reinstated, he "*shall* be allowed compensation for all or any part of the period of such suspension or termination * * *." [Emphasis supplied.] As the court says in the instant opinion:

"Once an employee is reinstated or restored to duty, this section made mandatory the payment of back pay. Leiner v. United States,

143 Ct.Cl. 806; Schwartz v. United States, Ct.Cl., 181 F.Supp. 408."

However, the court, in the language just quoted, having given the plaintiff relief, proceeded immediately to take back what it had just given by saying:

"However, this section did not, as plaintiff urges us to hold, require that the Secretary must allow compensation for the full period of the suspension."

And the court goes on to hold that compensation for only a part of the period of suspension satisfied the requirements of the statute.

To hold, as we did in Leiner, that the back-pay provision of the statute is mandatory, once reinstatement has been made, and to say, as the court does in the instant case, that this mandatory requirement is satisfied by giving back pay for a fraction of the period, is, in effect, to overrule Leiner. The Secretary can, under this decision, reinstate an employee after two years of suspension, saying that he never should have been suspended in the first place, but at the same time saying that he should receive back pay for only one day of the two years of his suspension.

The court's opinion urges that there is some equity in the fractional relief awarded in the instant case because the job to which the plaintiff had been appointed had been abolished. But the plaintiff had not been discharged. He had been transferred to other employment, and the only reason he was not worked or paid was because of the security suspension. There is not the slightest doubt about "the amount which * * * [the plaintiff] would normally have earned during the period of such suspension * * *."

In Leiner we said:

"Congress recognized that the statute, lodging arbitrary and final power in department heads, was a departure from normal Government personnel practice, justifiable only in the interest of national security. It tempered the severity of the statute

by granting discretion to the department heads to right possible wrongs committed under the statute by ordering reinstatement. Then it made mandatory the payment of back pay to such reinstated employees. 143 Ct.Cl. 806, 811."

"Equity delights to do justice, and that not by halves." Story, Equity Pleading, Section 72. I think Leiner was right, and I would not fractionalize the equity which the court accomplished in that case.